| | |
|---|---|
| GAIL COLIE, ET AL., | CIVIL ACTION No. 3:09-CV-00086 |
| *Plaintiffs,* | |
| v. | MEMORANDUM OPINION |
| CARTER BANK & TRUST, INC., | |
| *Defendant.* | JUDGE NORMAN K. MOON |

Gail Colie, Martha Collins, and Pamela Jeffries filed this complaint alleging sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*. Defendant, Carter Bank & Trust, Inc., filed a motion to dismiss (docket no. 5) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which the parties have fully briefed and argued. As described herein, Plaintiffs have sufficiently pleaded their claims to withstand the motion to dismiss, which I will deny.

## I. FACTUAL ALLEGATIONS

Plaintiffs worked together at Defendant's branch office on Gardens Boulevard in Charlottesville, Virginia. Colie began working at the Gardens Boulevard branch in November 2005, Jeffries began working there in December 2006, and Collins began working there in March 2007. Until April 2009, Plaintiffs' direct supervisor was Theresa Deese, who was the manager of the Gardens Boulevard branch. Deese's employment with Defendant was terminated in April 2009. Jeffries resigned from her position in May 2008, but as of the date of the hearing on the instant motion to dismiss, Colie and Collins remained in Defendant's employ.

Plaintiffs state that, "[i]mmediately following her hiring in December 2006, Jeffries was subjected to inappropriate, unwelcome comments and conduct of a sexual nature by Deese," and that these "comments and conduct continued . . . throughout Jeffries's employment at Carter Bank, which ended in May 2008." Plaintiffs state that, "almost daily during that period, Deese called the Plaintiffs 'Baby,'" but did not refer to men using that term. "Deese repeatedly, throughout her employment with Carter Bank, and almost daily, told Jeffries 'how sexy' she looked, how 'sexy' her legs are, and 'how sexy she looks with her hair down,' with Colie and Collins present." Plaintiffs state that "Deese's comments and actions constantly interfered with Jeffries's ability to perform her normal job duties"; that "Deese often made comments in front of other customers, as Jeffries assisted bank customers with deposits, withdrawals, or other banking transactions"; and that "Deese's comments and actions significantly affected Jeffries's psychological well-being."

Plaintiffs provide the following specifics regarding Jeffries's claim. "On February 7, 2007, Deese told Jeffries, 'Gosh, you look sexy with your hair down.' Colie and Collins regularly overheard Deese make similar comments to Jeffries.'" On April 12, 2007, "Deese yelled repeatedly at Jeffries and accused Jeffries of becoming very upset with her," and "asked Jeffries to 'take her out to lunch' so that Deese could 'kiss and make up with her.'" When "Jeffries told Deese to stop speaking to her in that way," "Deese, in front of other employees and customers, loudly told Jeffries that she was 'like a cat in a cat-fight' and made cat-sounding noises," and although "Jeffries told Deese to stop immediately," Deese refused and continued to embarrass Jeffries in front of other employees and customers." Two days later, Jeffries called Donna Burnoff, an administrative vice-president for Defendant, and specifically complained

about the incident of April 12, 2007, explaining to Burnoff that the behavior was unwelcome and needed to cease immediately. Burnoff responded, "If it happens again, call me."

In July 2007, Deese told Jeffries that she had "sexy legs," after having made similar comments previously. Jeffries told Deese that her comments were unwelcome and that they made her uncomfortable. That month, Deese underwent a surgical procedure and, on the day following her surgery, appeared at the Gardens Boulevard branch, where she approached the glass window of the drive-through, struck the window to get Jeffries's attention, and "ordered Jeffries to come outside." When Jeffries went outside to speak with Deese, Deese said "that she was 'sorry' and asked Jeffries 'to kiss and make up.'" Jeffries told Deese "to cease immediately," and "immediately called Burnoff and left her a message notifying her of Deese's behavior."

On August 30, 2007, Deese met a "male companion" at the bank during business hours, and the couple "proceeded to kiss and fondle each other while standing just outside the bank's front door, in plain view of all employees and customers," and the "male companion placed his hand inside of Deese's blouse in view of Jeffries, Colie, Collins, and other employees." Jeffries "immediately called Burnoff to inform her of Deese's behavior and its humiliating effect on the bank's employees who witnesses it," but "Burnoff did not respond." A few days later, "Deese returned to work and asked Jeffries, in front of several other employees, 'Have you ever used K-Y jelly?'" Collins overheard the question.

On September 4, 2007, Deese approached Jeffries's desk, where "Jeffries was reading a newspaper, and, on three or four separate occasions, touched her cheek to Jeffries's cheek for a minute to two minutes. Jeffries told her to stop immediately, but Deese continued." Collins and Colie witnessed these events.

On September 6, 2007, Deese "sat very closely next to Jeffries at her desk and asked . . . if Jeffries had ever had a sexually-transmitted disease." Jeffries responded negatively, "but Deese continued and described an infection she had recently contracted." Thereafter, Deese "discussed her sexually-transmitted diseases with Plaintiffs, despite Plaintiffs' protests," "on almost a weekly basis."

On September 11, 2007, Deese "cornered" Jeffries "in an area of the bank behind a teller station, between a locking door and a counter," and "physically prevented Jeffries from moving away from her and pressed her against the door and the edge of the counter." Jeffries "asked Deese to move and to let her go, but Deese refused." When "Jeffries screamed for help from . . . another teller who was on duty in a nearby room," Deese "smirked at Jeffries and walked away."

In October 2007, Burnoff held a meeting and group discussion between Deese and the employees of the branch, including Plaintiffs, and Deese apologized to the branch employees for unspecified reasons. Burnoff instructed the employees not to discuss the meeting any further, and instructed Plaintiffs that she did not want to receive any more complaints regarding Deese's behavior. Burnoff instructed Plaintiffs to keep any further complaints to themselves, and informed Collins that "Deese's 'punishment' was 'that she had to stay in her office; she was on probation.'" Thereafter, Deese approached Jeffries, accused her of complaining to Burnoff, and said to Jeffries, "You envy me," and "You're jealous of me."

Following the October 2007 meeting, Deese continued to subject Plaintiffs to sexual harassment, continuing to tell Jeffries on a regular basis that she had "sexy legs" and "sexy hair." Additionally, Deese boasted to Collins and Colie that she had received breast implants. In May 2008, after months of repeated harassment from Deese and following Defendant's failure to

address Deese's continuing behavior, despite numerous reports to Burnoff, Jeffries resigned her position at Carter Bank, because "[t]he actions of Carter Bank left Jeffries with no reasonable choice but to resign."

From November 2005 until May 2009, Colie was subjected to Deese's inappropriate, unwelcome comments, and conduct of a sexual nature. Colie often worked with Deese, just the two of them, on Saturdays, when Deese "regularly squeezed Colie and told her, 'It's just you and me, baby.'" This conduct occurred on a regular, almost weekly basis while Deese was employed as Colie's supervisor. Additionally, "Deese regularly stared at Colie, despite Colie's specific requests to Deese that she not stare at her." Following the October 2007 meeting with Burnoff, Deese told Colie, "Don't call Donna [Burnoff]; that's not going to help you. I'm here to stay."

In October or November of 2008, Deese complained loudly, in the presence of customers, that a check was missing from a customer deposit Colie had received. Deese claimed that she "found" the check in an area of the bank's deposit desk. Plaintiffs state that "Colie had never removed the check from her deposits; rather, upon information and belief, Colie pleads that Deese was attempting to accuse Colie of fraud as a pretext for an eventual termination of Colie." In December 2009, Burnoff placed Colie on a two-month probationary period for missing work; Plaintiffs state that Colie's absences were "because of a medical condition" and that "Colie provided doctor's excuses to Burnoff regarding the time she missed, but Burnoff still placed Colie on the probationary period."

From March 2007 until May 2009, Collins was subjected to Deese's inappropriate, unwelcome comments, and conduct of a sexual nature, and Deese asked Collins to inform her of any statements made by other bank employees about Deese. In approximately June 2007, and again in April 2008, Deese asked Collins to "stand beside Route 29 . . . , pull up her skirt, and

bring in some business for the bank." In March 2008, Deese asked Collins to don a "bunny suit" and stand beside Route 29 to bring in business for the bank.

In July 2009, Collins applied for another position at another Charlottesville branch of Carter Bank. Burnoff interviewed Collins for the position, but two weeks later hired another Carter Bank employee "who had not initially applied for the position. Burnoff stated to another employee of Carter Bank that Collins had not received the position because of the complaint she filed with [the] [Equal Employment Opportunity Commission ("EEOC")] regarding Deese's actions."

In May 2007, Deese announced to the branch's employees that she was having surgery the next day and that she would be out of the office. Deese asked the female employees at the branch to give her a hug before she left. Deese hugged Colie and, despite Colie's repeated requests, would not let her go. While hugging Colie, Deese asked Colie to kiss her. Colie refused and Deese released her. On that same day, as she was leaving, Deese told Jeffries agains that Jeffries had "sexy legs." Jeffries asked Deese to never say that to her again.

In the middle of September 2007, Burnoff and Carter vice-president Bill Oeters met with Deese in response to Jeffries's complaint regarding the incident of September 11, 2007. Following the meeting, Deese returned to the branch, announced, "I'm back," and "stared menacingly at Jeffries from 3 P.M. until approximately 5 P.M."

During the week following the October 2007 meeting with Burnoff, Deese conducted an investigation into the source of the complaints against her. Deese held individual interviews with Plaintiffs and other employees and asked each employee whether he or she had reported her behavior to Burnoff. Deese continued to interview Plaintiffs about the source of the complaints, even though Plaintiffs told Deese that they did not want to be interviewed and that any

complaints were confidential.  Deese regularly told Plaintiffs that she "could get people fired" if she wanted to, and after Jeffries left Defendant's employ in May 2008, Deese bragged to Colie and Collins that she had caused Jeffries to be fired.  She stated to Collins, "I could get you fired, too, if I want."

During Plaintiffs' employment, Deese often boasted to them that she had received her job because her boss, Bill Oeters, thought Deese was "pretty."  Deese boasted that Oeters had said she was pretty.  On December 22, 2008, in front of Collins and Colie, Deese stared directly down the blouse of a female customer service representative, and asked her to "pull up her shirt; it's been getting low."  Between September 2008 and February 2008, Deese regularly attempted to rub this particular customer service representative's back in front of Plaintiffs.

Plaintiffs allege that, as a result of Defendant's actions, and through those of its agents, including Oeters, Burnoff, and Deese, Plaintiffs have suffered past and future pecuniary losses (including past, present, and future lost earnings), emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.  Plaintiffs allege that Jeffries was constructively discharged by Defendant, and all Plaintiffs have incurred attorney's fees and other related costs.

Count I of the complaint alleges hostile work environment sexual harassment.  Plaintiffs state that they were subjected to continuing, unwelcome conduct of a sexual nature by Deese, their direct supervisor.  Plaintiffs contend that, but for their sex, they would not have been subject to Deese's conduct, and that Deese did not subject any of their male colleagues at the Gardens Boulevard branch to any harassing or sexual conduct.  Plaintiffs allege that Deese's conduct was pervasive and severe, and that it continued for years, even after they specifically complained to Burnoff and Oeters, and despite Plaintiffs' own repeated, specific requests that Deese cease.  Plaintiffs add that Deese's behavior caused them substantial humiliation in front of

their co-workers, materially affected thei abilities to complete their regular job duties, and created an intimidating, hostile, offensive working environment for them. Plaintiffs allege that Defendant was aware of the harassment, but failed to take appropriate, timely corrective action; Plaintiffs' attempts to improve their environment by notifying Burnoff and Oeters of Deese's conduct was essentially ignored.

Count II alleges retaliation. Plaintiffs allege that they complained of Deese's harassment to Burnoff and Oeters, but the failure to address Plaintiffs' complaints led to Jeffries's constructive discharge. Plaintiffs state that their complaints regarding Deese's conduct constitute protected activities under Title VII, and that, in response to their complaints, they were told to "stop complaining," and Burnoff specifically told them that she did not want to receive any more complaints or e-mails from Plaintiffs regarding Deese's behavior. Plaintiffs contend that, following Jeffries's complaints to Burnoff, Deese subjected Jeffries to further, severe harassment, and was constructively discharged. Plaintiffs add that, following Collins's complaints to Burnoff and her formal complaint to the EEOC, Collins was refused another position within the bank, and following Colie's complaints to Burnoff and the EEOC, Colie was placed on a two-month "probationary" period, and that, as a pretext, Defendant claimed that this action was taken because Colie had missed work.

It appears that Plaintiffs have properly exhausted their administrative remedies as required prior to filing suit. Plaintiffs timely filed claims with the EEOC and received "Right to Sue" letters from the EEOC on or about Ocober 1, 2009. Plaintiffs filed their charges with the EEOC on or about August 11, 2008, and the instant lawsuit was filed within 90 days of their "Right to Sue" letters. Plaintiffs seek the following: compensatory damages of $300,000.00 apiece; punitive damages of $300,000.00 apiece; interest and costs; reasonable attorney's fees;

## II. Standard of Review

Regarding motions to dismiss for failure to state a claim upon which relief may be granted, I apply the pleading standard established by *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937 (2009). *See also* Fed. R. Civ. P. 12(b)(6), Fed. R. Civ. P. 8. Plaintiffs must allege facts that "state a claim to relief that is plausible on its face," facts that "have nudged their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, ___ U.S. at ___, 129 S.Ct. at 1949. "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 93-4 (2007) (citations omitted); *see also Iqbal*, ___ U.S. at ___, 129 S.Ct. at 1950 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.") A motion to dismiss pursuant to Rule 12(b)(6) does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

## III. Discussion

### A. Sexual Harassment

To establish a Title VII claim for sexual harassment in the workplace, a plaintiff must show "that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive

work environment, and (4) was imputable to her employer." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (citations omitted). A woman may prove sex-based discrimination in the workplace even though she is not subjected to sexual advances or propositions. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998); *Ocheltree*, 335 F.3d at 331. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted); *see also Oncale*, 523 U.S. at 78.

Defendant argues that Plaintiffs failed to support their allegation that Deese's conduct was based upon sex, but that argument fails to acknowledge the numerous specific facts pleaded by Plaintiffs and the reasonable inferences to be drawn from those facts. Regarding the "because of sex" inquiry, "'[t]he critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Oncale*, 523 U.S. at 80 (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)). Plaintiffs' allegations extend far beyond simply claiming that Deese – their supervisor – called them "Baby," but did not use the term for any men in the office. Plaintiffs allege that, on an almost daily basis, Deese commented about "how sexy" Jeffries looked, how "sexy" her legs are, and "how sexy she looks with her hair down." Plaintiffs allege that Deese asked Jeffries to "kiss and make up" and loudly stated that Jeffries was "like a cat in a cat-fight." Plaintiffs allege that Deese asked Jeffries questions regarding whether Jeffries "ever used K-Y jelly" or had ever had a sexually transmitted disease. Plaintiffs allege that Deese, when working alone with Colie, often touched her and told her, "It's just you and me, baby." Plaintiffs allege that Deese asked

Collins to stand beside Route 29 and raise her skirt to attract "business for the bank." These factual allegations, when taken together with the other facts alleged in the complaint and reasonable inferences to be drawn by the court, constitute more than bald allegations of sex-based conduct.[1] And, although Defendant claims that Colie and Collins complain "simply of being the presence of Jeffries when Deese made unwanted comments to her," the factual allegations specifically allege facts that demonstrate behavior directed toward Colie and Collins.

Defendant argues that Plaintiffs allege nothing more than the sporadic use of rude language and occasional teasing, but this characterization is in sharp contrast to the factual allegations recounted at length above. "In deciding whether a jury could find that a work environment was objectively abusive, that is, abusive to 'a reasonable person in the plaintiff's position,'" *Ocheltree*, 335 F.3d at 333 (quoting *Oncale*, 523 U.S. at 82), I must "consider all of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance,'" *id.* (quoting Harris, 510 U.S. at 23). "This standard is designed to 'filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted)). Although Plaintiffs did not plead that they were unable to perform their jobs because of Deese's behavior, they did plead that her behavior materially affected their abilities to complete their regular job duties, and they alleged that Jeffries felt compelled to resign.

---

[1] The Supreme Court of the United States has remarked that "[c]ommon sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Oncale*, 523 U.S. at 82. *Oncale* concluded "that sex discrimination consisting of same-sex sexual harassment is actionable under Title VII. . . ." *Id.*

Plaintiffs also allege that Deese's conduct was frequent, rather than occasional or sporadic, that it was "inappropriate," "unwelcome," and "of a sexual nature," and that it continued on a regular basis from December 2006 until May 2008. Additionally, Plaintiffs alleged that Deese's conduct continued after Plaintiffs repeatedly asked her to cease, and that it continued even after Plaintiffs complained to Deese's supervisors.[2]

## B. Retaliation

Defendant argues that Plaintiffs did not engage in protected activity and thus failed to establish a prima facie case of retaliation under Title VII. Defendant concedes that reporting sexual harassment constitutes a "protected activity" under Title VII, but contends that Plaintiffs complained only of "unprofessional conduct of their supervisor." However, as I have already observed, a reasonable trier of fact could conclude that the conduct alleged in the complaint constitutes sexual harassment. Moreover, Defendant's argument that the conduct complained of was not "sexual harassment" is immaterial to the status of the act of complaining as a "protected activity" under Title VII. The activities protected under anti-retaliation provisions are much broader than the activities that may constitute discrimination. *See, e.g., Burlington North. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, (2006) ("[W]e conclude that Title VII's substantive provision and its antiretaliation provision are not coterminous. The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."). Plaintiffs allege that, following Collins's formal complaint with the EEOC, she was refused

---

[2] Plaintiffs allege that Jeffries specifically complained to a vice-president and administrative vice-president of Defendant about Deese's behavior, and alleges that Defendant's failure to address the complaints permitted Deese to initiate an investigation into the source of complaints against her. According to Plaintiffs, during the course of conducting their job duties, they were required to attend individual interviews with Deese about the source of the complaints, even though Plaintiffs informed Deese that they did not want to be interviewed. A reasonable trier of fact could conclude that Deese's investigation into the sources of confidential complaints constitutes a pervasive and severe intrusion into Plaintiffs' regular job duties.

another position within Defendant's bank because of her actions; she specifically pleads that, in July 2009, she was denied the position because of the complaint she filed with the EEOC. Plaintiffs specifically plead that, following Colie's formal complaint with the EEOC, she was placed, under a pretext, into a probationary status.[3] These allegations are sufficient to state a claim of retaliation.

## C. Constructive Discharge

Defendant contends that the facts alleged by Jeffries fail to establish a constructive discharge. An employee's reasonable decision to resign because of unendurable working conditions can be considered a formal discharge. *See Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004). The constructive discharge inquiry is an objective one: "Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Id*. (citation omitted). Although Jeffries must ultimately prove that her employer deliberately created "objectively intolerable" working conditions in an effort to force her to resign, *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004), the facts pleaded by Plaintiff, accepted as true, allege such conduct on Defendant's part sufficient to withstand Defendant's motion to dismiss. Plaintiffs allege that, on an almost daily basis from December 2006 to May 2008, Jeffries was subjected to Deese's unwelcome comments of a sexual nature. When Jeffries complained to Defendant's vice president and administrative vice president, she was instructed to keep any further complaints to herself. Deese, Jeffries's supervisor, was then told of the complaints, Deese proceeded to initiate an investigation into the

---

[3] At the hearing on the instant motion, Defendant's counsel argued that Ms. Colie's retaliation claim should fail because she was placed on probation for missing work, and not as a retaliatory measure. However, it would be inappropriate for me to make a factual determination at this stage. Additionally, Plaintiffs alleged that the reasons given for placing Colie on probation were pretextual.

supposedly confidential complaints of harassment, and Deese regularly boasted that she could "get people fired" if she wanted. The allegations reflect an employer deliberately ignoring an employee's attempts to assert federally protected rights.[4]

### D. Punitive Damages

Defendant argues that the complaint does "not state a plausible claim for punitive damages" because Plaintiffs failed to plead factual allegations sufficient to draw a reasonable inference that Defendant intentionally retaliated against Plaintiffs with malice or reckless indifference. In Title VII cases, "[p]unitive damages are available when the discriminatory action was conducted 'with malice or with reckless indifference to the federally protected rights' of the plaintiff." *Golson v. Green Tree Fin. Servicing Corp.*, 26 Fed. App'x 209, 213 (4th Cir. 2002) (quoting 42 U.S.C.A. § 1981a(b)(l)). "The terms 'malice' and 'reckless indifference' refer to 'the employer's knowledge that it may be acting in violation of federal law.'" *Id.* (quoting *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999)). Here, Plaintiffs alleged that Defendant was aware of Plaintiffs' complaints in October 2007 and that, despite these complaints, Defendant's administrative vice president instructed Plaintiffs that she "did not want to receive any more complaints regarding Deese's behavior" and that Plaintiffs were to keep any further complaints to themselves. Thereafter, Defendant continued to employ Deese as Plaintiffs' supervisor. The factual allegations sufficiently indicate malice and reckless indifference to Plaintiffs' federally protected rights.

---

[4] Defendant asks the court to consider a document tendered with its answer, stating that it is Jeffries's "letter of resignation" and that it demonstrates Jeffries voluntarily resigned, and thus could not have been constructively discharged. Additionally, at the hearing on this matter, Defendant argued that Plaintiffs' claims must fail because other documents tendered with its answer demonstrate that Plaintiffs failed to properly follow Defendant's procedures for such complaints, as set forth in Defendant's sexual harassment policy. The consideration of such evidence would be premature, as it would require the court to make a factual determination.

## E. Timeliness

Defendant claims that Colie and Collins failed to file their charges with the EEOC within 180 days after the allegedly unlawful employment practice, as required by 42 U.S.C. § 2000e-5(e)(1), and that "[a]ll of the sexual harassment claims alleged by Collins and Colie relating to Count I of the Complaint occurred outside the period of 180 days prior to their EEOC complaints." However, Colie and Collins allege that Deese subjected them to inappropriate, unwelcome comments and conduct of a sexual nature up to the termination of her employment with Defendant in April 2009, and Defendant states that Colie and Collins filed formal complaints with the EEOC that same month.[5] "[A] hostile environment claim involves one unlawful employment practice that can be comprised of a series of separate incidents. . . . As long as one component incident occurred within the applicable limitations period, every

---

[5] While extrinsic evidence is generally not to be considered at the Rule 12(b)(6) stage, a court may consider a document attached to a motion to dismiss if "it was integral to and explicitly relied on in the complaint and the plaintiffs do not challenge its authenticity." *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). Furthermore, "a court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed." *Witthohn v. Fed. Ins. Co.*, 164 Fed. Appx. 395, 396-97 (4th Cir. 2006); *see also Gasner v. Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995) (permitting district court to take judicial notice of public documents, such as court records, even when the documents are neither referenced by nor integral to plaintiff's complaint).

The complaint states that all three Plaintiffs filed charges with the EEOC on or about August 11, 2008. The exhibits attached to the complaint indicate that Plaintiffs filed formal complaints with the EEOC in April 2009, and that the EEOC issued "Right to Sue" letters on September 30, 2009. The "Right to Sue" letters stated, "More than 180 days have passed since the filing of this charge," and "The EEOC is terminating its processing of this charge." The "Right to Sue" letters also informed Plaintiffs that they could file suit in a federal or state court within 90 days of the receipt of the letter, and the instant action was timely filed.

With its motion to dismiss, Defendant has submitted copies of charges filed in April 2009 by Collins and Colie with the Virginia Council On Human Rights. With its reply to Plaintiffs' opposition, Defendant has submitted copies of notices from the EEOC to the Virginia Council On Human Rights, indicating that Colie and Collins's charges were filed on April 15, 2009, and April 7, 2009, respectively, and that, "[p]ursuant to the worksharing agreement, this charge is to be initially investigated by the EEOC." These documents suggest that Plaintiffs may have originally filed their charges with the Virginia Council On Human Rights, and thus are subject to a 300-day limitations period. Pursuant to 42 U.S.C. § 2000e-5(e)(1), a "300-day limitations period applies in states where charges are originally filed with or are automatically forwarded by the EEOC to a 'state deferral agency,' which investigates and adjudicates the charge." *Maiden v. County of Albemarle*, Civil Action No. 3:09-cv-00034, 2009 WL 2511951 at *3 n. 2 (W.D. Va. August 17, 2009). In any event, it appears that Plaintiffs' charges were timely filed with the EEOC within the 180-day period.

component incident of the hostile environment may be considered for purposes of liability regardless of when those events occurred." *Wilkinson v. Rumsfeld*, 100 Fed. Appx. 155, 158 (4th Cir. 2004) (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)).

## IV. CONCLUSION

For the stated reasons, Defendant's motion to dismiss (docket no. 5) will be denied.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this __19th__ day of May, 2010.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE