IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| GAIL COLIE, ET AL., | CIVIL ACTION No. 3:09-CV-00086 |
| *Plaintiffs,* | |
| v. | MEMORANDUM OPINION |
| CARTER BANK & TRUST, INC., | |
| *Defendant.* | JUDGE NORMAN K. MOON |

Gail Colie, Martha Collins, and Pamela Jeffries filed this complaint alleging sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*. Defendant, Carter Bank & Trust, Inc., filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which I denied on May 19, 2010. The matter is now before me on consideration of Defendant's motion for summary judgment (docket no. 29), which the parties have fully briefed and argued. Because the record does not support Plaintiffs' claims of an abusive work environment, constructive discharge, and retaliation for engaging in a protected activity, I will grant Defendant's motion for summary judgment.

## I. STANDARD OF REVIEW

A court may grant a motion for summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that [the moving party] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and of "demonstrat[ing] the absence of a genuine issue of material fact" to support the non-moving party's case. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists under Rule 56 "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion under Rule 56, the Court must construe all "facts and inferences to be drawn from the facts . . . in the light most favorable to the non-moving party." *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (quotations omitted). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. If the moving party meets its burden of production, the non-moving party cannot rest on its pleadings, but must present significant evidence in support of its claim to defeat the motion for summary judgment. *Id.* at 248-49.

## II. PLAINTIFFS' FACTUAL ALLEGATIONS

Plaintiffs worked together at Defendant's branch office on Gardens Boulevard in Charlottesville, Virginia. Colie began working at the Gardens Boulevard branch in November 2005, Jeffries began working there in December 2006, and Collins began working there in March 2007. Until April 2009, Plaintiffs' direct supervisor was Theresa Deese, who was the manager of the Gardens Boulevard branch. Deese's employment with Defendant was terminated in April 2009.

Plaintiffs state that, "[i]mmediately following her hiring in December 2006, Jeffries was subjected to inappropriate, unwelcome comments and conduct of a sexual nature by Deese," and that these "comments and conduct continued . . . throughout Jeffries's employment at Carter Bank, which ended in May 2008." Plaintiffs state that, "almost daily during that period, Deese called the Plaintiffs 'Baby,'" but did not refer to men using that term. "Deese repeatedly, throughout her employment with Carter Bank, and almost daily, told Jeffries 'how sexy' she

looked, how 'sexy' her legs are, and 'how sexy she looks with her hair down,' with Colie and Collins present." Plaintiffs state that "Deese's comments and actions constantly interfered with Jeffries's ability to perform her normal job duties"; that "Deese often made comments in front of other customers, as Jeffries assisted bank customers with deposits, withdrawals, or other banking transactions"; and that "Deese's comments and actions significantly affected Jeffries's psychological well-being."

Plaintiffs provide the following specifics regarding Jeffries's claim. "On February 7, 2007, Deese told Jeffries, 'Gosh, you look sexy with your hair down.' Colie and Collins regularly overheard Deese make similar comments to Jeffries.'" On April 12, 2007, "Deese yelled repeatedly at Jeffries and accused Jeffries of becoming very upset with her," and "asked Jeffries to 'take her out to lunch' so that Deese could 'kiss and make up with her.'" When "Jeffries told Deese to stop speaking to her in that way," "Deese, in front of other employees and customers, loudly told Jeffries that she was 'like a cat in a cat-fight' and made cat-sounding noises," and although "Jeffries told Deese to stop immediately," Deese refused and continued to embarrass Jeffries in front of other employees and customers." Two days later, Jeffries called Donna Burnopp,[1] an administrative vice-president for Defendant, and specifically complained about the incident of April 12, 2007, explaining to Burnopp that the behavior was unwelcome and needed to cease immediately. Burnopp responded, "If it happens again, call me."

In July 2007, Deese told Jeffries that she had "sexy legs," after having made similar comments previously. Jeffries told Deese that her comments were unwelcome and that they made her uncomfortable. That month, Deese underwent a surgical procedure and, on the day

---

[1] In the complaint, Plaintiffs refer to Ms. Burnopp as "Burnoff." The evidence indicates that the correct spelling is "Burnopp."

following her surgery, appeared at the Gardens Boulevard branch, where she approached the glass window of the drive-through, struck the window to get Jeffries's attention, and "ordered Jeffries to come outside." When Jeffries went outside to speak with Deese, Deese said "that she was 'sorry' and asked Jeffries 'to kiss and make up.'" Jeffries told Deese "to cease immediately," and "immediately called Burnoff [*sic*] and left her a message notifying her of Deese's behavior."

On August 30, 2007, Deese met a "male companion" at the bank during business hours, and the couple "proceeded to kiss and fondle each other while standing just outside the bank's front door, in plain view of all employees and customers," and the "male companion placed his hand inside of Deese's blouse in view of Jeffries, Colie, Collins, and other employees." Jeffries "immediately called Burnoff [*sic*] to inform her of Deese's behavior and its humiliating effect on the bank's employees who witnessed it," but "Burnoff [*sic*] did not respond." A few days later, "Deese returned to work and asked Jeffries, in front of several other employees, 'Have you ever used K-Y jelly?'" Collins overheard the question.

On September 4, 2007, Deese approached Jeffries's desk, where "Jeffries was reading a newspaper, and, on three or four separate occasions, touched her cheek to Jeffries's cheek for a minute to two minutes. Jeffries told her to stop immediately, but Deese continued." Collins and Colie witnessed these events.

On September 6, 2007, Deese "sat very closely next to Jeffries at her desk and asked . . . if Jeffries had ever had a sexually-transmitted disease." Jeffries responded negatively, "but Deese continued and described an infection she had recently contracted." Thereafter, Deese "discussed her sexually-transmitted diseases with Plaintiffs, despite Plaintiffs' protests," "on almost a weekly basis."

On September 11, 2007, Deese "cornered" Jeffries "in an area of the bank behind a teller station, between a locking door and a counter," and "physically prevented Jeffries from moving away from her and pressed her against the door and the edge of the counter." Jeffries "asked Deese to move and to let her go, but Deese refused." When "Jeffries screamed for help from . . . another teller who was on duty in a nearby room," Deese "smirked at Jeffries and walked away."

In October 2007, Burnopp held a meeting and group discussion between Deese and the employees of the branch, including Plaintiffs, and Deese apologized to the branch employees for unspecified reasons. Burnopp instructed the employees not to discuss the meeting any further, and instructed Plaintiffs that she did not want to receive any more complaints regarding Deese's behavior. Burnopp instructed Plaintiffs to keep any further complaints to themselves, and informed Collins that "Deese's 'punishment' was 'that she had to stay in her office; she was on probation.'" Thereafter, Deese approached Jeffries, accused her of complaining to Burnopp, and said to Jeffries, "You envy me," and "You're jealous of me."

Plaintiffs allege that, following the October 2007 meeting, Deese continued to subject Plaintiffs to sexual harassment, continuing to tell Jeffries on a regular basis that she had "sexy legs" and "sexy hair." Additionally, Deese boasted to Collins and Colie that she had received breast implants. According to Plaintiffs, in May 2008, after continued harassment from Deese and following Defendant's failure to address Deese's continuing behavior, despite numerous reports to Burnopp, Jeffries resigned her position at Carter Bank, because "[t]he actions of Carter Bank left Jeffries with no reasonable choice but to resign."

Plaintiffs allege that, from November 2005 until May 2009, Colie was subjected to Deese's inappropriate, unwelcome comments, and conduct of a sexual nature. Colie often

worked with Deese, just the two of them, on Saturdays, when Deese "regularly squeezed Colie and told her, 'It's just you and me, baby.'" Plaintiffs alleged that this conduct occurred on a regular, almost weekly basis while Deese was employed as Colie's supervisor. Plaintiffs add that "Deese regularly stared at Colie, despite Colie's specific requests to Deese that she not stare at her." Following the October 2007 meeting with Burnopp, Deese told Colie, "Don't call Donna [Burnopp]; that's not going to help you. I'm here to stay."

In October or November of 2008, Deese complained loudly, in the presence of customers, that a check was missing from a customer deposit Colie had received. Deese claimed that she "found" the check in an area of the bank's deposit desk. Plaintiffs state that "Colie had never removed the check from her deposits; rather, upon information and belief, Colie pleads that Deese was attempting to accuse Colie of fraud as a pretext for an eventual termination of Colie." Plaintiffs allege that, in December 2009, Burnopp placed Colie on a two-month probationary period for missing work; Plaintiffs state that Colie's absences were "because of a medical condition" and that "Colie provided doctor's excuses to Burnoff [*sic*] regarding the time she missed, but Burnoff [*sic*] still placed Colie on the probationary period."

Plaintiffs allege that, from March 2007 until May 2009, Collins was subjected to Deese's inappropriate, unwelcome comments, and conduct of a sexual nature, and Deese asked Collins to inform her of any statements made by other bank employees about Deese. According to Plaintiffs, in approximately June 2007, and again in April 2008, Deese asked Collins to "stand beside Route 29 . . . , pull up her skirt, and bring in some business for the bank," and in March 2008, Deese asked Collins to don a "bunny suit" and stand beside Route 29 to bring in business for the bank.

In July 2009, Collins applied for another position at another Charlottesville branch of

Carter Bank. Burnopp interviewed Collins for the position, but two weeks later hired another Carter Bank employee "who had not initially applied for the position." According to Plaintiffs, Burnopp "stated to another employee of Carter Bank that Collins had not received the position because of the complaint she filed with [the] [Equal Employment Opportunity Commission ("EEOC")] regarding Deese's actions."

In May 2007, Deese announced to the branch's employees that she was having surgery the next day and that she would be out of the office. Deese asked the female employees at the branch to give her a hug before she left. Deese hugged Colie and, despite Colie's repeated requests, would not let her go. While hugging Colie, Deese asked Colie to kiss her. Colie refused and Deese released her. On that same day, as she was leaving, Deese told Jeffries agains that Jeffries had "sexy legs." Jeffries asked Deese to never say that to her again.

In the middle of September 2007, Burnopp and Carter vice-president Bill Oeters met with Deese in response to Jeffries's complaint regarding the incident of September 11, 2007. Following the meeting, Deese returned to the branch, announced, "I'm back," and "stared menacingly at Jeffries from 3 P.M. until approximately 5 P.M."

According to Plaintiffs, during the week following the October 2007 meeting with Burnopp, Deese conducted an investigation into the source of the complaints against her. Deese held individual interviews with Plaintiffs and other employees and asked each employee whether he or she had reported her behavior to Burnopp. Deese continued to interview Plaintiffs about the source of the complaints, even though Plaintiffs told Deese that they did not want to be interviewed and that any complaints were confidential. Deese regularly told Plaintiffs that she "could get people fired" if she wanted to, and after Jeffries left Defendant's employ in May 2008, Deese bragged to Colie and Collins that she had caused Jeffries to be fired. She stated to

Collins, "I could get you fired, too, if I want."

Plaintiffs add that, during Plaintiffs' employment, Deese often boasted to them that she had received her job because her boss, Bill Oeters, thought Deese was "pretty." Deese boasted that Oeters had said she was pretty. On December 22, 2008, in front of Collins and Colie, Deese stared directly down the blouse of a female customer service representative, and asked her to "pull up her shirt; it's been getting low." Between September 2008 and February 2008, Deese regularly attempted to rub this particular customer service representative's back in front of Plaintiffs.

### III. Summary Judgment Record

Jeffries alleges that Deese created a hostile work environment by repeatedly calling Jeffries "baby" and telling Jeffries she was "sexy." Jeffries stated in her deposition testimony that she did not know whether any of Deese's actions were intended to make her quit. Jeffries further testified that, in April 2008, she applied for a management position at a Holiday Inn Express in Culpeper, Virginia, and that, on April 25, 2008, she provided Carter Bank with a "two-week notice" of her resignation. The position Jeffries accepted at Holiday Inn Express paid almost twice as much as her position at Carter Bank. Jeffries's letter of resignation stated that she was leaving Carter Bank because she had accepted a job with another employer. Jeffries testified that she was never denied a promotion, pay raise, bonus, or any other benefit during her time in Defendant's employ. Jeffries testified that Deese promoted her from teller to customer service representative. Jeffries has not sought any medical treatment as a result of the conduct alleged in the complaint.

Colie testified that Deese watched her work, which made her feel funny, and that, on some Saturdays when it was just Colie and Deese working, Deese would "put her arm up around

[Colie's] shoulder and hug [her] and say it's you and me, baby." Colie testified that, on one occasion when Deese was leaving the office to have surgery, all of the office personnel gave Deese hugs and wished her luck with the surgery. Colie stated that she willingly hugged Deese and wished her luck, but felt uneasy when Deese asked Colie to give her a kiss. Colie testified that she received all of the pay raises, bonuses, and other benefits to which she was entitled during her employment at Carter Bank. Colie testified that she has not sought any medical treatment as a result of the conduct alleged in the complaint.

Colie also alleges that she was retaliated against when Thomas Cole, Deese's successor as manager of the Gardens Boulevard branch, placed Colie on probation for unexcused absences. Cole testified that Colie missed several weeks of work without providing appropriate medical excuses, even after Colie was informed of the need for medical excuses. Cole testified that he informed Colie that she was on probation for 60 days, but that the probation had nothing at all to do with a sexual harassment claim. He further stated that, in fact, his superior, Donna Burnopp, denied his request to put Colie on probation, and that Colie was never placed on probation. Colie affirmed that her "retaliation" claim was based on nothing more than "a gut feeling."

Colie further testified that she felt Deese had attempted to set her up and get her fired. Colie testified that Deese approached her about a deposit slip that did not have a check or cash attached to it. Colie testified that she and Martha Collins searched for the check but could not find it, but Deese then searched the same area and found the check. Colie testified that she believed Deese placed the check there in an attempt to get her fired because the check was "folded" and she knew "for a fact that [the customer] never brings a folded check in there"; however, the customer provided an affidavit stating that he remembers the instance and that the check in question may have been "folded" because he sometimes carries a "folded" check in his

wallet which he later deposits at the bank.

Collins testified that she filed the instant suit "because of the comments [Deese] made, not just to [her,] but to the other employees." Collins testified that Deese commented that the bank needed more business, and on one occasion said to Collins, "Why don't you go out on Route 29 . . . and hold your skirt up" to lure customers in. Collins testified that, during Easter one year, Deese joked, "Why don't you wear your bunny suit . . . tomorrow and go out on 29 and bring customers in[?]" Collins testified that she received all of the pay raises, bonuses, and other benefits to which she was entitled during her employment at Carter Bank. Collins testified that, after Jeffries quit, Deese promoted Collins from teller to customer service representative. Collins testified that she has not sought any medical treatment as a result of the conduct alleged in the complaint.

Collins asserts that she was retaliated against when she was not given a transfer from the Gardens Boulevard branch to the Fifth Street branch. In the complaint, Collins alleges that Donna Burnopp, a Vice President of Carter Bank, told another Carter Bank employee, now identified as Tiffany Belew, that Collins had not received the transfer because of the EEOC complaint she filed regarding Deese. However, Belew testified under oath that Donna Burnopp never made such a statement, and that Burnopp actually told her that Collins had not been transferred "because of everything that was going on." Belew testified that she had mistakenly interpreted "everything that was going on" to refer to the EEOC complaint. Belew and Burnopp have both testified that what "everything that was going on" really meant was that Collins was not transferred because positions at both branches had been filled with new people and Burnopp wanted to keep some continuity for the sake of customers of the Gardens Boulevard branch.

William Oeters, senior vice president of Carter Bank, testified that the first complaint he

received about Deese was in a September 2007 e-mail from Alan Wegner, a male drive-thru teller at the Gardens Boulevard branch. Oeters testified that Wegner's e-mail complained about Deese talking about her personal life within the bank. Oeters testified that, shortly after he received Wegner's e-mail, Jeffries called to complain that Deese had told her that she had sexy legs, that Deese had commented about her hair, and that Deese had kissed a man in front of the bank.

Oeters testified that he made the decision to go to the Gardens Boulevard office with Burnopp on September 17, 2007, to discuss these complaints with all the employees. Oeters testified that at the meeting, Jeffries did most of the talking and raised the same issues she had mentioned in the telephone call. Oeters testified that stated at the meeting that the bank takes these matters very seriously, that the bank had a "no harassment" policy, and that if anyone felt that they were being harassed, they should follow the procedures set forth in that policy. Oeters further testified that he told the employees that he would have Deese come to Fredericksburg and that he would speak to her about the allegations.

Oeters testified that, a week after the initial meeting with employees on September 17, 2007, he and Burnopp met with Deese in Fredericksburg. Oeters testified that he told Deese that there were some serious allegations being made about her regarding unprofessional conduct. Oeters testified that he informed Deese that she needed to conduct herself in a more professional manner, and instructed her to "avoid a lot of this idle chit-chat that's going on within the branch." Oeters received further complaints about Deese in October, 2007, when he received e-mails from Collins and Wegner about Deese now being overly quiet toward the other employees, including Plaintiffs, and requiring Wegner to remain at his drive-thru post throughout his shift. Oeters testified that he believed another meeting was needed, and that

Deese should be a part of the meeting so that everybody could air whatever issues they had. Oeters sent Burnopp and Dennis Hall, both of whom were on the operational side of the bank, to the October meeting and had them report back to him.

Burnopp testified that she and Dennis Hall went to the Gardens Boulevard branch for the meeting in October 2007. Burnopp testified that Collins, Colie, Jeffries, and Deese where there, but that Wegner decided not to attend the meeting. She testified that Jeffries complained that Deese had invaded her space by being too close to her while she stood at the computer. Burnopp testified that they told her that they did not like Deese telling them, "I'm the boss, you have to listen to me." Burnopp also testified that the employees complained that Deese had told them they could no longer put puzzles together while they were working in the teller line. Burnopp testified that Deese apologized to all the employees present at the meeting.

Following this second meeting, Hall periodically inquired of Jeffries whether she had any further complaints about Deese, and Jeffries always assured Hall that all was well. Oeters and Burnopp testified that after the meeting in October 2007, they heard no more complaints until Plaintiffs filed their EEOC Complaints in April 2009.

## IV. DISCUSSION

### A. Hostile Work Environment

To establish a Title VII claim for sexual harassment in the workplace, a plaintiff must show "that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (citations omitted). I find that, although the conduct complained of here was unpleasant and unprofessional, it was not sufficiently severe or

pervasive to create an abusive work environment. "Title VII, after all, is not 'a general civility code," *EEOC v. Fairbrook Medical Clinic*, 609 F.3d 320, 327-328 (2010) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)), and does not attempt "to purge the workplace of vulgarity," *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995). "As the Supreme Court has emphasized, 'not all workplace conduct that may be described as "harassment" affects a "term, condition, or privilege" of employment within the meaning of Title VII.'" *Fairbrook Medical Clinic*, 609 F.3d at 327-328 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). "'To be actionable, sexual harassment must be objectively hostile or abusive, and the victim must subjectively perceive it as such.'" *Id. (*citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). In determining whether a hostile work environment exists, a court must look at the totality of the circumstances, which includes consideration of the following relevant factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

The conduct alleged here does not reach the requisite level of severity.[2] There is no evidence that the workplace was "permeated with 'discriminatory intimidation, ridicule, and insult,'" *Harris*, 510 U.S. at 21 (quoting *Meritor Savings Bank*, 477 U.S. at 65), "that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

---

[2] To be sure, the conduct alleged here is annoying and arguably offensive, and insofar as Jeffries is concerned, it occurred frequently enough to support claims of a hostile work environment. *See, e.g.*, *E.E.O.C. v. R & R Ventures*, 244 F.3d 334, 337 (4th Cir. 2001) (supervisor made sexual comments to an employee every time the two worked together); *Patterson v. County of Fairfax*, 215 F.3d 1320 (Table), 2000 WL 655984, at * 4 (4th Cir. May 18 2000) (Title VII is not violated when there were only a few incidents of sexually motivated behavior over a period of time); *Hopkins v. Baltimore Gas and Elec. Co.*, 77 F.3d 745, 753 (1996) ("'A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage.'") (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995)); *Spencer v. General Electric Co.*, 697 F. Supp. 204, 213 (E.D. Va. 1988) (supervisor engaged in sexual horseplay on a daily basis, which included physically sitting on employees' laps and touching employees in an intimate manner).

abusive working environment,'" *id.* (quoting *Meritor Savings Bank*, 477 U.S. at 67). There is no evidence that Deese "targeted [Plaintiffs] with highly personalized comments designed to demean and humiliate" them. *Fairbrook Medical Clinic*, 609 F.3d at 328.[3] "[W]hile no one condones boorishness, there is a line between what can justifiably be called sexual harassment and what is merely crude behavior." *Ziskie v. Mineta*, 547 F.3d 220, 228 (4th Cir. 2008). Activities like simple teasing, offhand comments, and off-color jokes do not cross the line into actionable misconduct. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "If they did, courts would be embroiled in never-ending litigation and impossible attempts to eradicate the ineradicable, and employers would be encouraged 'to adopt authoritarian traits' to purge their workplaces of poor taste." *Fairbrook Medical Clinic*, 609 F.3d at 328 (quoting *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 318 (4th Cir. 2008)).

Deese's actions -- most frequently, calling female employees "baby" and telling Jeffries she looked "sexy" -- may have been unprofessional, but these comments amount to nothing more than "mere offensive utterance[s]," *Harris*, 510 U.S. at 23, which do "not amount to discriminatory changes in the 'terms and conditions of employment,'" *Faragher*, 524 U.S. at 788. That Deese watched Colie and thus made Colie "feel funny" simply does not establish grounds for a hostile work environment claim; it is plain that Deese's job was to watch and supervise the employees in the bank. Deese's occasional comment to Colie, "it's you and me,

---

[3] It is helpful to compare the allegations in the instant case with a brief recapitulation of the conduct complained of in *Fairbrook Medical*. The defendant in *Fairbrook Medical* (the defendant was the sole owner of the Fairbrook Medical Clinic) exhibited an x-ray that included a "shadowy," yet "highly visible" image of his penis to other people in his clinic "at least 25 to 30 times," and referred to the image as "Mr. Happy." 609 F.3d at 323. The defendant used "sex-specific and derogatory terms" to refer to women at the clinic, and spoke about female body parts, including his own wife's, in graphic terms. *Id.* at 327. Several of the defendant's remarks involved "explicit or implicit proposals of sexual activity." *Id.* The defendant asked the plaintiff "if she had a better libido while she was pumping her breasts, opined that she was probably a 'wild thing' in bed, and requested to view and pump her breasts." *Id.*

baby," when Deese and Colie were the only two working, and asking Colie for a hug and a kiss when Colie wished Deese well before her surgery, amount to nothing more than off-hand comments and isolated incidents. These incidents do not suggest that the workplace was "permeated with 'discriminatory intimidation, ridicule, and insult,'" *Harris*, 510 U.S. at 21 (quoting *Meritor Savings Bank*, 477 U.S. at 65), "that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,'" *id.* (quoting *Meritor Savings Bank*, 477 U.S. at 67). Although Colie gave deposition testimony that Deese's comments "got more and more about things of a personal nature," there simply is no evidence that Deese "targeted [Colie, or any of Plaintiffs] with highly personalized comments designed to demean and humiliate" them. *Fairbrook Medical Clinic*, 609 F.3d at 328.

As for Ms. Collins, she complains of only three incidents specifically involving her. "[C]onsidering 'all the circumstances,'" *Oncale*, 523 U.S. at 81 (quoting *Harris*, 510 U.S. at 23), these incidents regarding Collins are not severe or pervasive, as Collins's allegations involve only three isolated and thus non-actionable incidents, *see Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997) (observing that the plaintiff identified only four gender-based comments). Although Deese may have behaved distastefully toward Collins on these occasions (by teasing that Collins should lure customers into the bank by standing on Route 29 and hitching up her skirt or wearing a "bunny suit"), these isolated incidents are examples of the kind of simple teasing, offhand comments, and off-color jokes that do not cross the line into actionable misconduct. *Faragher*, 524 U.S. at 788 (1998).

### B. Constructive Discharge

Jeffries claims that Deese's conduct toward her constitutes a constructive discharge. In the Fourth Circuit, "an employee is constructively discharged 'if an employer deliberately makes

the working conditions of the employee intolerable in an effort to induce the employee to quit.'" *Whitten v. Fred's, Inc.*, 601 F.3d 231, 248 (4th Cir. 2010) (quoting *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1353-54 (4th Cir. 1995)). A constructive-discharge plaintiff must therefore allege and prove two elements: (1) deliberateness of the employer's actions and (2) intolerability of the working conditions. *Id.*

To prove deliberateness, the plaintiff must prove that the actions complained of were intended by the employer as an effort to force the employee to quit. *Id.* Jeffries has testified that she does not know whether Deese's actions were deliberately intended to force her to quit, and the record indicates that, in fact, Deese promoted Jeffries. Accordingly, Jeffries fails to establish the deliberateness of the employer's actions. *Id.*

Furthermore, to sustain a claim of constructive discharge, Jeffries must establish that Deese created "objectively intolerable" working conditions in an effort to force her to resign. *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004). To rise to the level of "objectively intolerable" working conditions, the conduct must be extreme. "[D]ifficult or unpleasant working conditions are not so intolerable" as to support a constructive discharge claim. *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994). Having found that the conduct alleged here does not reach the requisite level of severity to sustain Plaintiffs' hostile work environment claims in the face of Defendant's motion for summary judgment, I likewise find that the record fails to establish that Jeffries was subjected to the "objectively intolerable" working conditions necessary to sustain a claim of constructive discharge. Moreover, the record -- including Jeffries's own deposition testimony -- indicates that Jeffries quit Carter Bank because she found a better-paying job with Holiday Inn Express, and none of Jeffries's co-workers ever felt compelled to resign. Nothing but Jeffries's unsupported assertions suggest that she quit Carter

Bank because of "intolerable" working conditions there. "If the evidence shows that the plaintiff . . . quit for a reason other than his working conditions, then logically the plaintiff was not constructively discharged." *Strickland v. Jewell*, 562 F. Supp. 2d 661, 674 (M.D. N.C. 2007).

### C. Retaliation

Colie and Collins have lodged claims that they were retaliated against for having engaged in the protected activity of filing an EEOC complaint regarding Deese's conduct. To prove a prima facie case of retaliation, a plaintiff must show that "(1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271 (4th Cir. 2001) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001), *overruled on other grounds* by *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67-68 (2006)). My memorandum opinion of May 19, 2010, denying Defendant's motion to dismiss, explained that Plaintiffs were engaged in protected activity. However, upon review of the record on summary judgment, I find that Plaintiffs cannot establish the additional elements of a retaliation claim.

### 1. Colie

An adverse action need not be an ultimate employment action, such as termination, that affects the terms and conditions of employment, but it must be one that "a reasonable employee would have found . . . materially adverse," meaning that it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68; *see, e.g., Darveau v. Detecon, Inc.*, 515 F.3d 334 (4th Cir. 2008) (finding an adverse action where the employer filed a lawsuit against the employee alleging fraud). "Acts

that carry 'a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects' may be considered adverse actions, although 'a mere inconvenience or an alteration of job responsibilities' will not suffice." *Reinhardt v. Albuquerque Public Schools Bd. of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010) (citation omitted). Nor do petty slights, minor annoyances, and lack of good manners create such a deterrence. *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68.

Colie claims that she "was placed on a two-month probationary period by Burnopp for missing work because of a medical condition." However, Thomas Cole testified that in the fall of 2009, he told Colie that she was being placed on 60 days of probation, but the reason for this was clearly because Colie had failed to provide medical excuses for days missed from work and failed to communicate to the bank that she would not be working. Furthermore, Donna Burnopp testified that she never approved Cole's request to place Colie on probation, and, in fact, Colie was never placed on probation. Additionally, Cole and Burnopp have both testified that the mere suggestion that Colie be placed on probation had nothing to do with the filing of an EEOC claim against the bank, and the record supports Defendant's assertion that the idea of placing Colie on a probationary status was solely a result of Colie's absenteeism, including her failure to obtain proper medical excuses and to communicate to the bank that she would not be working. Indeed, Colie's deposition testimony regarding this matter acknowledges that she has no evidence to support her claim, but only a "gut feeling" that Carter Bank retaliated against her for filing an EEOC claim.

The evidence establishes that Defendant did not take any adverse employment action against Colie, and thus her retaliation claim does not meet the requirements of *Matvia*. Furthermore, even if being unofficially and incorrectly informed that she was being placed on

probation could be considered an adverse employment action, Defendant proffers legitimate, non-retaliatory reasons for threatening to place her on probation, which Colie does not sufficiently rebut. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (once a plaintiff establishes her prima facie case, the employer may rebut it by presenting evidence of a legitimate, non-retaliatory reason for the adverse action; after the employer presents this evidence, the burden shifts back to the employee to show that the proffered reason is pretextual).

To meet the "causal connection" requirement, a plaintiff must show that the adverse action would not have occurred "but for" the protected conduct. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365-66 (4th Cir. 1985) *overruled on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). When considering the causation element, "'mere knowledge on the part of an employer that an employee . . . has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons' for adverse personnel action against that employee." *Carter v. Ball*, *supra*, 33 F.3d at 460 (quoting *Williams v. Cerberonics, Inc.*, *supra*, 871 F.2d at 457). Here, given Defendant's legitimate reasons for considering (but ultimately rejecting) the corrective action of probation, there is no "but for" causal connection between Defendant unofficially and erroneously placing Colie on probation and her filing of an EEOC claim. *See, e.g., Maiden v. County of Albemarle*, Civil Action No. 3:09-cv-00034, 2009 WL 2511951 (W.D. Va. 2009).

## 2. Collins

Collins claims that she was the subject of retaliation because in June 2009 she was not transferred from a customer service representative ("CSR") position at the Gardens Boulevard branch to a CSR position at the Fifth Street branch. Donna Burnopp and William Oeters, who were in charge of filling the CSR position at the Fifth Street branch, provided deposition

testimony that Collins was not transferred to the Fifth Street branch because Defendant desired to maintain some degree of continuity at the Gardens Boulevard branch. Collins had knowledge and experience of the customers at the Gardens Boulevard branch, so keeping her there was preferable for the bank, rather than transferring her and having to replace her with someone who did not know the customer base.

To support her claim of retaliation, Collins relies on gossip. Collins claims that Tiffany Belew, another bank employee, was told by Burnopp that Collins had not received the transfer because of the complaint she filed with EEOC regarding Deese's actions. However, Belew's deposition testimony indicates that Burnopp did not tell her this, but that Belew initially misinterpreted what Burnopp said, and that Burnopp actually told Belew that Collins was not transferred because Gardens Boulevard already had a new manager who did not know the customers, and Burnopp did not want to move Collins to Fifth Street and replace her at Gardens Boulevard with a new CSR who did not know the customers at Gardens Boulevard.

In any event, in order to establish a claim for retaliation Collins must show that she was subjected to an adverse employment action by her employer. Although Collins engaged in a protected activity, she cannot show that any retaliatory act had an adverse effect on the terms, conditions, or benefits of her employment, as there were no acts that had any such effect. *See Von Gunten*, *supra*, 243 F.3d at 866. As discussed above, an adverse action need not be an ultimate employment action, such as termination, that affects the terms and conditions of employment, but it must be one that "a reasonable employee would have found . . . materially adverse," meaning that it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68. Here, not granting a transfer from one branch to another was not materially adverse to Collins.

Furthermore, assuming *arguendo* that being denied a transfer from one branch to another constitutes an adverse employment action, there is no evidence that Collins was denied a transfer because she filed an EEOC claim. Collins points to no direct evidence of retaliation, and all of the evidence establishes that there were valid, non-retaliatory reasons, which she does not rebut, for not transferring her to the Fifth Street branch. And, as with Colie, Collins cannot satisfy the causation element of her retaliation claim. Even if a protected activity and adverse employment action are shown, an employee must also show not only that the adverse employment action took place after the protected activity, *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651 (4th Cir. 2002), but also that the adverse employment action occurred *because of* the protected activity, *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998). I repeat that the "'mere knowledge on the part of an employer that an employee . . . has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons' for adverse personnel action against that employee." *Carter v. Ball*, *supra*, 33 F.3d at 460 (quoting *Williams v. Cerberonics, Inc.*, *supra*, 871 F.2d at 457). As with Colie's retaliation claim, there is insufficient evidence of a causal connection between Collins's not being transferred to Fifth Street and her filing of an EEOC claim.

## V. CONCLUSION

For the stated reasons, Defendant's motion for summary judgment (docket no. 29) will be granted. The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this ___28th___ day of October, 2010.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE